# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | | |
|---|---|---|
| JENNIFER RENZI, as | ) | |
| Administrator of the Estate of | ) | |
| Jack Jeffrey Murphy-Renzi, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:24CV211 |
| | ) | |
| NAPHCARE, INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This matter is before the court on two motions. Defendant NaphCare, Inc., has filed a Motion to Dismiss (Docket Entry 12), and Defendants Bobby Kimbrough, Brian Gilroy and James Tyner have filed a Motion to Dismiss (Docket Entry 20). Plaintiff Jennifer Renzi has filed responses in opposition to both motions. (Docket Entries 17 and 26.) Defendants have filed replies. (Docket Entries 23 and 28.) The matters are now ripe for disposition. For the following reasons, the undersigned recommends that NaphCare's Motion to Dismiss be denied and that the Sheriff Defendants' Motion to Dismiss be granted in part and denied in part.

## I.    BACKGROUND

Jennifer Renzi ("Plaintiff") brought this action following the death of her son Jack[1] Murphy-Renzi ("Mr. Murphy-Renzi") "on or about March 12, 2022" while in the custody of the Forsyth County Law Enforcement Detention Center ("Detention Center") between March 4,

---

[1] Plaintiff refers to Mr. Murphy-Renzi as "Jack." (*See* Complaint ("Compl."), Docket Entry 1 ¶ 1.)

2022, and March 12, 2022. (*See generally* Compl.) At the time of his death, Mr. Murphy-Renzi was a pretrial detainee in custody on a charge of driving while impaired ("DWI"). (*See id.* ¶¶ 1, 44, 47, 66, 222, 233.) Plaintiff names as Defendants NaphCare, Inc. ("NaphCare"), a company providing medical services to the Detention Center; Forsyth County Sheriff Bobby Kimbrough ("Sheriff Kimbrough"); and two officers working for the Sheriff's Office at the Detention Center at the time of the alleged incidents: Brian Gilroy ("Corporal Gilroy") and James Tyner ("Officer Tyner"). (*Id.* at 1.)[2] Sheriff Kimbrough, Corporal Gilroy, and Officer Tyner are referred to collectively as the "Sheriff Defendants." The Complaint alleges claims pursuant to 42 U.S.C. § 1983 (*id.* ¶¶ 28, 207-40, 283) and alleges claims under North Carolina state law (*id.* ¶¶ 241-78). Because the matter is before the Court on motions to dismiss, the Court relies on the facts as set forth by Plaintiff. *See Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009).

Mr. Murphy-Renzi was originally arrested "on or about September 1, 2021," on a charge of DWI and booked into the Detention Center, then subsequently released on bail on September 19, 2021. (Compl. ¶¶ at 44-45.) Mr. Murphy-Renzi's parents revoked his bond because he was struggling with alcohol and other substances, and they were worried for his safety. (*Id.* ¶¶ 46-47.) He was "surrendered … to the Detention Center on March 4, 2022." (*Id.* ¶ 47.) "[Mr. Murphy-Renzi's] booking report contained 'Jail Alerts' stating[,] 'SPECIAL ADMIN. MEASURES, PROTECTIVE CUSTODY.' " (*Id.* ¶ 67.) When Mr. Murphy-Renzi "was admitted to the Detention Center on March 4, 2022, he was a healthy nineteen-year-old man." (*Id.* ¶ 2.)

---

[2] Unless otherwise noted, all citations herein refer to the page numbers at the bottom right-hand corner of the documents as they appear in the Court's CM/ECF system.

Mr. Murphy-Renzi was discovered dead on the floor of his cell between 2:10 a.m. and 2:16 a.m. on March 12, 2022. (*Id.* ¶ 118-124.) Plaintiff alleges the "medical examiner determined that Jack's manner of death was natural and that his cause of death was 'probably cardiac dysrhythmia with contraction band necrosis' and that he also had mild dehydration." (*Id.* ¶ 140.) The medical examiner detected 8-aminoclonazolam in Mr. Murphy-Renzi's blood; Plaintiffs allege this is a metabolite of clonazolam, a benzodiazepine drug with a short half-life, "meaning Jack ingested an illicit drug" while in the custody of the Forsyth County Sheriff's Office ("FCSO"). (*Id.* ¶¶ 141-42.)

Plaintiff alleges that in the time Mr. Murphy-Renzi was at the Detention Center prior to his death, "his mental and physical condition rapidly deteriorated, which was obvious to other inmates in his housing unit and was or should have been apparent to the FCSO officers and NaphCare staff who were regularly in the housing unit." (*Id.* ¶ 4.) Plaintiff alleges that Defendants' actions and omissions while Mr. Murphy-Renzi was in custody violated his constitutional rights and that Defendants are responsible for his death. (*Id.* ¶¶ 12, 162, 163, 198, 206, 216, 226-27, 239, 250, 257, 263, 269, 271, 277, 283.) Plaintiff seeks monetary damages against Defendants. (*Id.* ¶¶ 279-285; *see also id.* at 71.)

The Complaint alleges the following grounds for relief:

1. A claim against NaphCare alleging deliberate indifference to Mr. Murphy-Renzi's serious medical and mental health needs, brought pursuant to 42 U.S.C. § 1983;

2. A claim against Sheriff Kimbrough in his official and individual capacities alleging deliberate indifference to Mr. Murphy-Renzi's serious medical and mental health needs, pursuant to 42 U.S.C. § 1983;

3. A claim against Corporal Gilroy and Officer Tyner in their individual capacities alleging deliberate indifference to Mr. Murphy-Renzi's serious medical and mental health needs, pursuant to 42 U.S.C. § 1983;

3

4. A claim against NaphCare for wrongful death under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2;

5. A claim against Sheriff Kimbrough, in his official and individual capacities, for wrongful death under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2;

6. Claims against Corporal Gilroy and Officer Tyner in their individual capacities for wrongful death under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2;

7. A claim against the Sheriff Defendants for injury to a prisoner by a jailer in violation of N.C Gen. Stat. § 162-55;

8. A claim against all Defendants for gross negligence.

(*See id.* ¶¶ 207-78.)  On April 3, 2024, NaphCare filed a Motion to Dismiss pursuant to Federal Rules of Civil Procedure 8 ("Rule 8") and 12(b)(6) ("Rule 12(b)(6)").  (Docket Entry 12; *see also* Docket Entry 13.)  On May 16, 2024, the Sheriff Defendants filed a Motion to Dismiss pursuant to Rule 8, Rule 12(b)(6), and Federal Rules of Civil Procedure 12(b)(1) ("Rule 12(b)(1)"), 12(b)(2) ("Rule 12(b)(2)"), and 12(b)(7) ("Rule 12(b)(7)").  (Docket Entry 20; *see also* Docket Entry 21.)  Plaintiff has responded to both motions (Docket Entries 17 and 26), Defendants have replied (Docket Entries 23 and 28), and the matters are ripe for disposition.

## II.    DISCUSSION

### Motions to Dismiss Under Rule 8

First, all Defendants argue that the Complaint should be dismissed because it does not comply with Rule 8.  Defendant NaphCare argues that Plaintiff made a "shotgun pleading" that contains substantial unnecessary information unrelated to the claims and fails to clarify which claims are brought against which Defendants.  (Docket Entry 13 at 6-9.)  The Sheriff

4

Defendants similarly argue that Plaintiff's Complaint is a "shotgun pleading" that "simultaneously says too much and too little." (Docket Entry 21 at 4-5.)

Rule 8(a)(2) provides that a complaint "must contain . . . a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Its purpose is to "give the defendant fair notice of what the . . . claim is and the grounds upon which it rests. . . ." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)); *see also*, *Plumhoff v. Cent. Mortg. Co.*, 286 F. Supp. 3d 699, 701-02 (D. Md. 2017). Fair notice is provided by setting forth enough facts for the complaint to be "plausible on its face" and "raise a right to relief above the speculative level on the assumption that all the allegations in the complaint are true (even if doubtful in fact)[.]" *Twombly*, 550 U.S. at 555, 570 (internal citations omitted).

When determining whether to dismiss a complaint for failure to comply with Rule 8(a), courts have looked to various factors, including "the length and complexity of the complaint, [and] whether the complaint was clear enough to enable the defendant to know how to defend himself[.]" *North Carolina v. McGuirt*, 114 F. App'x 555, 558 (4th Cir. 2004) (internal citations omitted). The Fourth Circuit has explained that dismissing a complaint with prejudice pursuant to Rule 8 "is an extreme sanction that must be examined carefully." *Id.* at 559.

A "shotgun pleading" is one that "fails to articulate claims with sufficient clarity to allow the defendant to frame a responsive pleading" or one in which "it is virtually impossible to know which allegations of fact are intended to support which claims for relief." *Wilkinson v. Wells Fargo Bank, N.A.*, No. 3:19-CV-00580-RJC, 2020 WL 2542867, at *3 (W.D.N.C. May 19, 2020), *aff'd sub nom. Wilkinson v. FINRA*, No. 22-1090, 2023 WL 418063 (4th Cir. Jan. 26,

Case 1:24-cv-00211-WO-JLW   Document 29   Filed 02/10/25   Page 5 of 47

2023) (citation omitted)). Shotgun pleadings violate Rule 8 and warrant dismissal of a plaintiff's complaint. *See id.* at *3-4.

Here, Plaintiff's Complaint is 72 pages and lists eight claims against four defendants. The Complaint arguably includes information beyond the scope of the claims. For example, the Complaint addresses Mr. Murphy-Renzi's early years of life, including his having been adopted, information about the medical company who was contracted to provide medical services to the Detention Center before NaphCare, and details about how the Forsyth County Board of Commissioners awarded NaphCare its contract. (*See* Compl. ¶¶ 31-33, 40.)

However, while the Complaint is not a model of clarity, the undersigned cannot conclude that it fails to provide Defendants with notice of the claims against them and the grounds upon which they rest as required by Rule 8. In fact, Defendants' motions, which identify the individual causes of action against the parties and address why they should be dismissed, indicate the Complaint gives them adequate notice of the claims against them as required by Rule 8. *See Jones v. Safe Streets USA LLC*, No. 5:19-CV-394-BO, 2020 WL 3261096, at *3 (E.D.N.C. June 16, 2020). In other words, Defendants were able to frame responsive pleadings (Docket Entries 12, 20; *see also* Docket Entries 23, 28) that demonstrated their knowledge of "which allegations of fact are intended to support which [claim(s) for relief[,]" thus precluding a dismissal of Plaintiff's Complaint as a "shotgun pleading." *See SunTrust*, 2012 WL 7062086 at *7.[3] Thus, the Complaint

---

[3] *See also, e.g., Reyes v. Fla. A&M Univ. Bd. of Trustees*, No. 6:22-CV-1525-WWB-DCI, 2024 WL 4122891, at *3 (M.D. Fla. Sept. 9, 2024) ("Despite its many shortcomings and excessive overinclusion, Plaintiff's Second Amended Complaint gives Defendant adequate notice of her claims and is not virtually impossible to understand."); *Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d 1313, 1324 (11th Cir. 2015) ("[T]his is not a situation where a failure to more precisely parcel out and identify the facts relevant to each claim materially increased the burden of understanding the factual allegations underlying each count.").

satisfies Rule 8, and the undersigned therefore recommends that each Motion to Dismiss should be denied to the extent that each argues that the Complaint be dismissed pursuant to Rule 8.

**Motions to Dismiss Under Rule 12(b)(6)**

Defendants also argue that each Motion to Dismiss should be granted because the Complaint fails to state claims against them upon which relief may be granted under Rule 12(b)(6). (Docket Entry 13 at 9-18; Docket Entry 21 at 5-25.) When considering a motion to dismiss pursuant to Rule 12(b)(6), a court must determine whether the complaint is legally and factually sufficient. *See Ashcroft v. Iqbal*, 556 U.S. 662, 677-79 (2009); *Twombly*, 550 U.S. at 570. To survive this determination, a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 570).

"A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.*; *see also Simmons v. United Mortg. and Loan Inv., LLC,* 634 F.3d 754, 768 (4th Cir. 2011). The "court accepts all well-pled facts as true and construes these facts in the light most favorable to the plaintiff," but does not consider "legal conclusions, elements of a cause of action, and bare assertions devoid of further factual enhancement [or] … unwarranted inferences, unreasonable conclusions, or arguments." *Nemet Chevrolet,* 591 F.3d at 255 (citations omitted). In other words, the standard requires a plaintiff to articulate facts that, when accepted as true, demonstrate the plaintiff has stated a claim that makes it plausible he is entitled to relief. *Francis v. Giacomelli,* 588 F.3d 186, 193 (4th Cir. 2009) (quoting *Iqbal,* 556 U.S. at 678, and *Twombly,* 550 U.S. at 557).

7

**Claims One, Two, and Three - Deliberate Indifference to Serious Medical Need**

In Claim One Plaintiff asserts NaphCare is liable for deliberate indifference to a serious medical need. (Compl. ¶¶ 207-17.) In Claim Two Plaintiff asserts Sheriff Kimbrough is liable, in his individual capacity and in his official capacity, for deliberate indifference to a serious medical need. (*Id.* ¶¶ 218-28.) In Claim Three Plaintiff asserts Corporal Gilroy and Officer Tyner are liable, in their individual capacities, for deliberate indifference to a serious medical need. (*Id.* ¶¶ 229-40.) All three claims are brought pursuant to 42 U.S.C. §§ 1983 and 1988. (*Id.* at 45, 47, 52.) The Sheriff Defendants and NaphCare each respectively move to dismiss the claims against them for failure to state a claim. (Docket Entry 13 at 9-14; Docket Entry 21 at 5-20.)

**Section 1983 Deliberate Indifference Liability**

"[T]o sustain an action under § 1983, a plaintiff must demonstrate that: (1) he suffered a deprivation of "rights, privileges, or immunities secured by the Constitution and laws" of the United States; and (2) the act or omission causing the deprivation was committed by a person acting under color of law." *West v. Atkins*, 487 U.S. 42, 45 n.3 (1988). "It is well settled that individuals 'have the right to receive adequate medical care while incarcerated.' " *May v. Johnson*, No. 7:23-CV-00794, 2024 WL 4831879, at *2 (W.D. Va. Nov. 19, 2024) (citing *DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018)). For pretrial detainees, the right falls under the Due Process Clause of the Fourteenth Amendment. *See Tarashuk v. Givens*, 53 F.4th 154, 158 (4th Cir. 2022) (concluding that "a pretrial detainee's right to adequate medical care and freedom from deliberate indifference to his serious medical needs was clearly established" at time of events in question).

The Due Process Clause of the Fourteenth Amendment "protects pretrial detainees from 'governmental action' that is not 'rationally related to a legitimate nonpunitive

8

governmental purpose' or that is 'excessive in relation to that purpose.' " *Short v. Hartman*, 87 F. 4th 593, 608-09 (4th Cir. 2023) (citation omitted). A pretrial detainee may "state a claim under the Fourteenth Amendment, based on a purely objective standard, for prison officials' deliberate indifference to excessive risks of harm." *Id.* at 604-05. To state a claim for deliberate indifference to a medical need, a pretrial detainee must plead that:

> (1) they had a medical condition or injury that posed a substantial risk of serious harm; (2) the defendant intentionally, knowingly, or recklessly acted or failed to act to appropriately address the risk that the condition posed; (3) the defendant knew or should have known (a) that the detainee had that condition and (b) that the defendant's action or inaction posed an unjustifiably high risk of harm; and (4) as a result, the detainee was harmed.

*Short*, 87 F. 4th at 611. Under the standard adopted in *Short*, a plaintiff asserting a Fourteenth Amendment claim of deliberate indifference does not have "to show that the defendant had actual knowledge of the detainee's serious medical condition and consciously disregarded the risk that their action or failure to act would result in harm." *Id.* at 611. Rather, a plaintiff need only show the defendant "should have known of that condition and that risk, and acted accordingly." *Id.* However, it is not enough to allege a party acted "negligently or accidentally failed to do right by the detainee." *Id.* at 612 (internal citations and quotation marks omitted).

**Section 1983 *Monell* Liability for Municipalities and Private Corporations**

Municipalities and other local governments are included among those "persons" to whom § 1983 applies. *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690. Generally, an action of liability against a municipality under § 1983 only exists when its official policy or custom causes a deprivation of an individual's constitutional rights. *See id.* at 690-91; *Carter v. Morris*, 164 F.3d 215, 218 (4th Cir. 1999); *Oliver v. Baity*, 208 F. Supp. 3d 681, 688 (M.D.N.C. 2016). Municipal liability under § 1983 applies to local government entities, including local government officials

9

sued in their official capacity, when "the action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690 & n.55 (1978); *see also Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (noting that claims against public officials in their official capacities are claims against the government entity that employs the official).

"To prevail on a *Monell* claim, a plaintiff must 'adequately plead and prove the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of their rights.'" *Rice v. Cecil Cnty., Maryland*, No. CV MJM-23-2344, 2024 WL 4335722, at *5-6 (D. Md. Sept. 27, 2024) (citing *Jordan v. Jackson*, 15 F.3d 333, 338 (4th Cir. 1994)). However, "[a]lthough prevailing on the merits of a *Monell* claim is difficult, simply alleging such a claim is, by definition, easier." *Owens*, 767 F.3d at 403. The applicable standard for adequately stating a *Monell* claim is set forth below:

> A policy or custom for which a municipality may be held liable can arise in four ways: (1) through an express policy, such as a written ordinance or regulation; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifest[s] deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

*Starbuck v. Williamsburg James City Cnty. Sch. Bd.*, 28 F.4th 529, 533 (4th Cir. 2022) (internal brackets omitted) (quoting *Lytle v. Doyle*, 326 F.3d 463, 471 (4th Cir. 2003)). "Sporadic or isolated violations of rights will not give rise to *Monell* liability; only widespread or flagrant violations will." *Owens v. Balt. City State's Att'ys Off.*, 767 F.3d 379, 403 (4th Cir. 2014) (internal quotation omitted).

To state a *Monell* claim, a plaintiff must: (1) "plausibly allege a constitutional harm that stems from the acts of a municipal employee [taken in furtherance of some] municipal policy or custom;" (2) "allege facts showing that the policy's creation is fairly attributable to the municipality;"

10

and (3) "allege an affirmative causal link between the 'policy or custom,' and the particular injury suffered by the plaintiff." *Washington v. Baltimore Police Dep't*, 457 F. Supp. 3d 520, 532 (D. Md. 2020) (citing *Milligan v. City of Newport News*, 743 F.2d 227, 229 (4th Cir. 1984) (quoting *Monell*, 436 U.S. at 694); *Spell v. McDaniel*, 824 F.2d 1380, 1389 (4th Cir. 1987); *Owens*, 767 F.3d at 402.

A private corporation may be liable under § 1983. *Austin v. Paramount Parks, Inc.*, 195 F.3d 715, 728 (4th Cir. 1999); *see also West*, 487 U.S. at 54-55 (explaining that a private entity that contracts with the state to provide medical services acts "under color of state law"). "[A] private corporation is not liable under § 1983 for torts committed by [its employees] when such liability is predicated solely upon a theory of *respondeat superior*." *Austin,* 195 F.3d at 728 (citations omitted). "[A] private corporation is liable under § 1983 *only* when an official policy or custom of the corporation causes the alleged deprivation of federal rights." *Id.* (citations omitted) (emphasis in original).

## Claim One - Plaintiff has stated a claim for deliberate indifference against NaphCare.

The Court first considers NaphCare's motion to dismiss Plaintiff's claim of deliberate indifference against NaphCare.

## Plaintiff sufficiently alleges that Mr. Murphy-Renzi's constitutional rights were violated.

At the outset, NaphCare argues that Plaintiff's claim should be dismissed because she fails to allege a constitutional violation causing Mr. Murphy-Renzi's death. (Docket Entry 13 at 9-11.) The undersigned disagrees. Plaintiff has sufficiently alleged that NaphCare committed a constitutional violation:

> Defendants' actions violated Jack's clearly established and well-settled fundamental rights under the United States Constitution, including the right to adequate, necessary, and emergency medical care while in custody; the right to due process before being deprived of his life; [and] the right to substantive due process under the Fourteenth Amendment [....] NaphCare was deliberately

11

indifferent to the serious medical needs of Jack, who was exhibiting obvious
signs of severe mental distress, which required immediate treatment.

(Compl. ¶¶ 164; 209.) These allegations are sufficient to state a claim for a pretrial detainee's

right to be free from deliberate indifference to their serious medical need or needs.

Next, Plaintiff has sufficiently alleged that Mr. Murphy-Renzi had a medical condition

that posed him a substantial risk of serious harm. Plaintiff alleges variously that Mr. Murphy-

Renzi had an "obvious and serious medical condition" (*id.* ¶ 206) and that his "life-threatening

mental health and/or medical condition went completely unaddressed." (*Id.* ¶ 216; *see also id.*

¶¶ 4-10, 93-94, 227, 234, 276.) Although occasionally inconsistent or conflicting, the facts

Plaintiff alleges make it plausible that Mr. Murphy-Renzi's "condition" could have been all of

the following: mental distress, disturbance, and illness that included suicidality (*see id.* ¶¶ 5, 10,

100, 101, 122, 130, 135, 137, 158, 211; *but see* ¶¶ 52, 63, 64, 94), alcoholism and addiction (*id.*

¶¶ 43, 46; *but see* ¶¶ 64, 74), and an inclination to harm himself (*id.* ¶ 47).[4]

NaphCare argues that "Plaintiff fails to allege that Mr. Murphy-Renzi had a 'serious

medical need[.]'" (Docket Entry 13 at 11.) The undersigned disagrees. "A 'serious medical

need' is a condition 'diagnosed by a physician as mandating treatment or one that is so

obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"

*DePaola v. Clarke*, 884 F.3d 481, 486 (4th Cir. 2018) (citing *Heyer v. U.S. Bureau of Prisons*, 849

F.3d 202, 210 (4th Cir. 2017) (citation omitted)).

Here, Plaintiff does not allege that Mr. Murphy-Renzi was ever diagnosed by a physician

with a condition requiring treatment. Therefore, to state a claim that Mr. Murphy-Renzi had a

---

[4] In her Response, Plaintiff argues that "Jack's deteriorating mental health presented an
objectively obvious serious medical need." (Docket Entry 17 at 9.)

12

serious medical need, Plaintiff must rely on the condition-obvious-to-a-layperson category recited above. Plaintiff does just that when she alleges that "[d]espite the lack of documentation from the FCSO or NaphCare about Jack's condition, other inmates … reported that Jack was behaving erratically, such as talking to himself, arguing with himself, staying up all hours of the night yelling, refusing to eat, and expressing suicidal ideation." (Compl. ¶ 101; *see also id.* ¶ 103.) Furthermore, Plaintiff alleges that

> The inmate in cell 8D-18 … stated [that] Jack appeared to be having mental issues, was always talking to and arguing with himself, was keeping other inmates up all night making noise, and was stating he was going to kill himself. The inmate reported that one day Jack was yelling for help that "he's stabbing me," suggesting Jack was hallucinating. The inmate reported that he and other inmates knew Jack was refusing to accept meal trays or was not eating meals and was not given a chance to leave his cell and/or refused to leave his cell to shower or for recreation time the entire time he was there ….

(*Id.* ¶ 130.) Plaintiff also alleges elsewhere that Mr. Murphy-Renzi exhibited "erratic and bizarre behavior" that was "obvious to the other inmates." (*Id.* ¶ 154.) Plaintiff alleges Mr. Murphy-Renzi was refusing food (*id.* ¶¶ 94(d), 139), naked in his cell (*id.* ¶¶ 99, 115, 118, 123), talking to himself (*id.* ¶ 103), hallucinating (*id.* ¶ 138) and non-responsive (*id.* ¶ 103; *see also id* ¶ 118). Plaintiff also alleges that "NaphCare's agent or employee, Breannon Jernigan EMT" ("Jernigan") (*id.* ¶ 118) "stated that it was reported to her by one of her NaphCare colleagues that Jack had been asking officers for help throughout the day on March 11, 2022, but she did not know if he ever got any help" (*id.* ¶ 131). Finally, Plaintiff alleges that Jack's medical records from his prior detention contained information about his "ongoing mental health problems" and showed that he "needed close observation." (*See id.* ¶ 245(a).) Taken together, these facts, accepted as true, make it at least

plausible that Plaintiff stated a claim that Mr. Murphy-Renzi had a "serious medical need;" thus NaphCare's motion to dismiss should not be granted on the basis that Plaintiff failed to do so.[5]

Next, Plaintiff alleges NaphCare failed to appropriately address the risk that Mr. Murphy-Renzi's serious medical condition posed. (*Id.* ¶¶ 4-5, 10, 130, 151-54, 158-61.) Specifically, Plaintiff alleges that rather than "complying with … NaphCare policies to monitor Jack and provide appropriate care for his worsening condition, Jack was entirely ignored by … NaphCare personnel as he continued to talk to himself, yell at all hours, argue with himself, bang on his cell door, threaten suicide, and refuse meals." (*Id.* ¶ 5.) Plaintiff further alleges that NaphCare knew that Mr. Murphy-Renzi "was exhibiting concerning behavior," but "did not attempt to assess or treat [his] condition." (*Id.* ¶ 10.) Plaintiff alleges NaphCare's inaction posed an unjustifiably high risk of harm. (*See id.* ¶¶ 145-54, 158-61; *see also id.* ¶¶ 247-48.)

Plaintiff alleges that "[t]he right to reasonable medical treatment is a clearly established constitutional right … that any reasonable medical care provider in a similar position as NaphCare should and would have known and did in fact know." (*Id.* ¶ 215.) Plaintiff alleges that, as a result of NaphCare's "deliberate indifferen[ce] to the serious medical needs of Jack, who was exhibiting obvious signs of severe mental distress, which required immediate treatment," he "died a slow, painful, terrifying, preventable, and completely unnecessary death." (*Id.* ¶¶ 209, 216; *see also id.* ¶¶ 162-63.) Together, these allegations are sufficient under the standard set forth in *Short* to state a claim for deliberate indifference to a serious medical need. However, this alone is insufficient

---

[5] *Cf. Est. of Rice ex rel. Rice v. Corr. Med. Servs.*, 596 F. Supp. 2d 1208, 1222 (N.D. Ind. 2009) (jury could conclude decedent had serious medical need prior to death where he was allegedly "suicidal" and "refus[ed] his medication and food, became non-communicative and started exhibiting bizarre behavior such as walking around his cell naked").

14

to preclude NaphCare's motion to dismiss.  Rather, "[h]aving concluded that Plaintiff has plausibly alleged that a constitutional violation occurred, the issue becomes whether the [Defendant, a private corporation,] can be held liable." *Dean v. Campbell*, No. 5:22-CV-167-KDB-DCK, 2023 WL 5281945, at *6 (W.D.N.C. July 14, 2023), *report and recommendation adopted*, No. 5:22-CV-167-KDB-DCK, 2023 WL 5281514 (W.D.N.C. Aug. 16, 2023).

**Plaintiff sufficiently alleges private corporation *Monell* liability against NaphCare.**

Plaintiff alleges that "it was NaphCare's widespread custom, policy, or practice to deny inmates and detainees access to necessary medical and mental health services by using unlicensed, untrained staff to conduct limited, infrequent, cursory assessments of inmates in segregation and to instead rely largely on detention officers to monitor inmates." (Compl. ¶ 214.)  Plaintiff alleges that "[a]s a direct and proximate result of NaphCare's deprivations and violations of Jack's constitutional and federally protected rights … Jack's life-threatening mental health and/or medical condition went completely unaddressed," which caused him to die.  (*Id.* ¶ 216.)

NaphCare argues that this allegation is "broad and wholly conclusory" and that it "directly contradicts other allegations of Plaintiff's Complaint, where she states that there are specific NaphCare policies requiring frequent monitoring and detailed documentation of patients in segregated housing."  (Docket Entry 13 at 13.)  NaphCare argues that "the only specific policies identified by Plaintiff are those she implicitly accepts as appropriate and constitutional."  (*Id.*)  NaphCare goes on to argue that Plaintiff alleges that the relevant and applicable policies were not enforced, and that Plaintiff's allegations "simply do not give rise to a claim for violation of [§] 1983 as to NaphCare."  (*Id.*)  Lastly, NaphCare argues Plaintiff

fails to allege sufficient facts causally connecting the policy or custom to Mr. Murphy-Renzi's death. Plaintiff alleges that Mr. Murphy-Renzi's death was

15

natural and caused by a "[p]robable cardiac dysrhythmia with contraction band necrosis" – an abnormal heart rhythm with heart muscle cell damage. … Yet none of the policies ostensibly identified in Plaintiff's Complaint … can be plausibly considered the cause of Mr. Murphy-Renzi's heart condition or death, let alone the "moving force." Absent this causal link, Plaintiff's claim fails[.]

(*Id.*) The undersigned disagrees. Plaintiff alleges that Mr. Murphy-Renzi's death was caused by NaphCare customs of infrequently and inadequately assessing detainees, which manifests deliberate indifference to their serious medical needs (Compl. ¶¶ 209-15); of hiring unqualified personnel (*id.* ¶¶ 37, 176, 178, 184, 214); of being chronically understaffed (*id.* ¶¶ 35, 36, 165, 167, 168, 174, 180); and of improperly treating patients, as evidenced by its having been named in many lawsuits nationwide and being found culpable for improper treatment of inmates in two cases (*see id.* ¶¶ 191-94).

Some of these claims tend to be undermined by Plaintiff's allegations that NaphCare had policies in place whose purpose was to prevent deliberate indifference to serious medical needs. For example, Plaintiff alleges that some individuals did not comply with "NaphCare policies" that required them to monitor Mr. Murphy-Renzi. (*See id.* ¶ 5.) Plaintiff also alleges that "NaphCare had a policy in effect for Segregated Patients, which was part of the medical plan required by N.C. Gen. Stat. § 153A-225,"[6] but that those policies were not followed with respect to Mr. Murphy-Renzi. (*Id.* ¶¶ 151-53.) While these allegations do state a plausible

---

[6] Said policy required staff to make and document regular medical rounds of patients in extreme isolation and of those with limited contact with others. (Compl. ¶ 151.) Plaintiff alleges this policy also required staff to "promptly identify and inform custody officials of patients who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health." (*Id.*) N.C. Gen. Stat. § 153A-225, in pertinent part, sets forth requirements that "[e]ach unit that operates a local confinement facility shall develop a plan for providing medical care for prisoners in the facility."

claim that NaphCare failed to abide by its own policies, they fail to allege that an official NaphCare policy was the moving force behind the alleged deliberate indifference here.

Similarly, Plaintiff alleges that NaphCare had a custom or practice of hiring staff members without the appropriate medical training or certifications. (*Id.* ¶ 214; *see also id.* ¶¶ 184-94.) Plaintiff alleges that NaphCare regularly had multiple vacancies for licensed medical providers during the time Mr. Murphy-Renzi was detained in March 2022 (*id.* ¶¶ 186-88) but does not allege that NaphCare had an official policy of being understaffed. However, elsewhere in the complaint, Plaintiff alleges that NaphCare was awarded a contract to provide healthcare services to inmates at the Detention Center that obligated NaphCare to staff "qualified licensed mental health professional, psychiatric nurse or other [sic] that is a professional individual who by virtue of their education, credentials and experience are [sic] permitted by law to evaluate and care for the mental health needs of inmates." (*Id.* ¶ 37.) *Cf. Rice*, 2024 WL 4335722, at *7 (finding that Plaintiff's allegation that a private medical corporation had contracted with a prison to provide medical care to detainees tended to undermine any inference that the corporation had policies in place to deny medical care to detainees).

Next, Plaintiff alleges that NaphCare "repeatedly failed to meet 'key quality indicators' and received a notice of concern from the FCSO for failing to meet contract standards each month of the year in 2022, including failing to meet the key quality indicators for conducting segregation rounds in February 2022." (*Id.* ¶ 190.) However, Plaintiff does not explain what "key quality indicators" are, nor how they relate to the death of Mr. Murphy-Renzi. Plaintiff also fails to explicate on the nature of "a notice of concern." Without more, these allegations do not state a sufficient claim for the existence of a causal link between a policy and Mr. Murphy-Renzi's death.

17

However, Plaintiffs do state a sufficient claim with their last set of allegations. Plaintiffs allege that "NaphCare's improper treatment of patients is not limited to the Detention Center, but spans across the country[,]" and that "NaphCare has been named in 857 federal lawsuits."[7] (*Id.* ¶¶ 191-92.) Plaintiffs further allege that a Virginia investigation of "NaphCare's substandard treatment of inmates" resulted in a determination that "NaphCare's conduct with respect to a mentally ill inmate who died of unclear causes was 'significantly more culpable than that of any other actor involved in [that] case.' " (*Id.* ¶ 193.) Similarly, Plaintiff alleges that a recent Washington state case resulted in a multi-million-dollar award for compensatory and punitive damages "supported by evidence of 'NaphCare's reckless disregard and derogation of the rights of those under its care, which it was hired to protect.' " (*Id.* ¶ 194.)

Here, Plaintiff "has alleged facts—the existence of [hundreds of federal lawsuits and two findings that NaphCare had some degree of culpability in situations similar to the instant case]—which, if true, would buttress [her] legal conclusion." *Owens*, 767 F.3d at 403. The essence of said conclusion is that there is both a failure to properly train officers that manifests deliberate indifference to the rights of pretrial detainees and a "practice to deny … detainees access to necessary medical and mental health services by using unlicensed, untrained staff to conduct limited, infrequent, cursory assessments of inmates in segregation" that are so persistent and

---

[7] The Court takes judicial notice of the fact that "NaphCare" has been named as a party in a lawsuit 1,013 times and "Naph Care" has been named as a party 214 times. *See* Administrative Office of the U.S. Courts, PACER Service Center: http://pacer.gov/ (last visited February 9, 2025). Cases have also been brought against "N.A.P.H. Care," "Naph Care Medical," "Naph Care Medical Department," and " Naph–Care Inc." Courts may take judicial notice *sua sponte*, *see* Fed. R. Evid. 201(c), and consider judicially noticed documents at the motion to dismiss stage, including court documents that are "public records whose authenticity is not in dispute." *See Massey v. Ojaniit*, 759 F.3d 343, 348 (4th Cir. 2014). A court may take judicial notice of undisputed matters of public record, which may include court records available through PACER. *See* Fed. R. Evid. 201(b); *United States v. Howard*, 381 F.3d 873, 876 n.1 (9th Cir. 2004).

widespread among NaphCare's operations as to constitute a custom or usage with the force of law among its personnel.  (*See* Compl. ¶¶ 160, 214; *see also id.* ¶¶ 53, 59-60, 63(l), 64(d), 96, 159.)  This is sufficient to state a claim for a custom under the third and fourth categories articulated in *Lytle*.[8]  Likewise, it is sufficient to allege a constitutional harm, as discussed above, and that the existence of the policy is fairly attributable to NaphCare.

**Plaintiff sufficiently alleges that NaphCare's custom caused Mr. Murphy-Renzi's death.**

Lastly, Plaintiff has also sufficiently alleged an affirmative causal link between this custom and Mr. Murphy-Renzi's death.  Plaintiff alleges that the medical examiner determined that Jack's cause of death was "[p]robable cardiac dysrhythmia with contraction band necrosis."  (*Id.* ¶ 140.)[9]  Plaintiff also alleges that a metabolite of a benzodiazepine was found in Mr. Murphy-Renzi's blood, "meaning Jack ingested an illicit drug while in the FCSO's custody."  (*Id.* ¶ 141.)  Plaintiff further alleges that the Medical Examiner noted that after his death, Mr. Murphy-Renzi's body had numerous injuries, including abrasions, bruises, scabs, and a hemorrhage.  (*Id.* ¶ 143.)

Plaintiff goes on to allege that "[p]hotos and videos of Jack's body show that he had bruises around both wrists that are consistent with being forcibly restrained and that some of his fingernails were broken."  (*Id.* ¶ 144.)  Taken together and accepted as true, these allegations make

---

[8] Again, those categories are "(3) through an omission, such as a failure to properly train officers, that 'manifest[s] deliberate indifference to the rights of citizens'; or (4) through a practice that is so 'persistent and widespread' as to constitute a 'custom or usage with the force of law.'  *Lytle*, 326 F.3d at 471 (4th Cir. 2003).

[9] Plaintiff argues that "there is ample authority positing that extreme stress (such as that which can occur with untreated serious mental health issues) can *cause* sudden death from an irregular heart rhythm."  (Docket Entry 17 at 17 (citations omitted) (emphasis added).)

it at least plausible that the alleged custom of NaphCare to staff inadequately trained personnel and its deficient monitoring of detainees could have caused Mr. Murphy-Renzi's death. If he did indeed have a serious medical condition, which Plaintiffs have sufficiently alleged, and if he had taken drugs and/or was violently injured, either by himself or others, severely enough to cause the above noted injuries, being adequately monitored and given adequate medical care by properly trained personnel might have prevented his death. Again, at the motion to dismiss stage, "[t]he recitation of facts need not be particularly detailed" when alleging a *Monell* claim, "and the chance of success need not be particularly high." *Owens*, 767 F.3d at 403. Ultimately, when a plaintiff alleges facts—even "brief, but non-conclusory" allegations such as "the existence of [similar] cases"—a *Monell* claim is sufficiently pled. *See id.* at 403-04.

Here, Plaintiff has done so. "[Plaintiff's] brief, but non-conclusory, allegations … resemble those in *Haley v. City of Boston*, 657 F.3d 39 (1st Cir. 2011)." *Id.* at 403. "The *Haley* court concluded that [the] "volume" of other cases documenting [the misconduct at issue] lent credence to the claim that policymakers 'encouraged, or at least tolerated' an impermissible practice." *Id.* at 403-04 (citing *Haley*, 657 F.3d at 53). "Accordingly, '[a]lthough [the complaint was] couched in general terms,' the court concluded that [it] nonetheless 'contain[ed] sufficient factual content to survive a motion to dismiss.' " *Id.* at 404 (citing *Haley*, 657 F.3d at 53). "The same reasoning applies here. Of course, to prevail on the merits, [Plaintiff] will have to do more than *allege* a pervasive practice of [NaphCare] misconduct; [she] must *prove* it." *See id.* But at this early stage in the proceedings, the undersigned must conclude that Plaintiff has pled sufficient factual content regarding all aspects of their deliberate indifference claim against NaphCare,

20

including causation. Accordingly, the Court recommends that Defendant's motion to dismiss as to Plaintiff's *Monell* claim against NaphCare be denied.

## Claim Two - Plaintiff has stated a claim for deliberate indifference against Sheriff Kimbrough in his individual capacity.

The Court turns next to Claim Two, Plaintiff's allegations of deliberate indifference to the serious medical needs of Mr. Murphy-Renzi against Sheriff Kimbrough in both his official and individual capacities. Plaintiff concedes that the Sheriff Defendants' evidence establishes governmental immunity as to the official capacity claims.[10] (*See* Docket Entry 26 at 22; *see also* Declaration of Christy Byers, Docket Entry 22.) Thus, the undersigned recommends that the Sheriff Defendants' motion to dismiss as to the deliberate indifference subclaim against Sheriff Kimbrough in his official capacity be granted and turns now to the individual capacity subclaim.

Sheriff Kimbrough argues that the individual capacity subclaim against him for deliberate indifference should be dismissed because Plaintiff fails to allege that he had any direct or personal involvement in the deprivation of Mr. Murphy-Renzi's rights. (Docket Entry 21 at 11-12.) The undersigned disagrees. Section 1983 individual liability may be established via personal involvement or under a theory of supervisory liability. To establish such liability under the first category, "a plaintiff must affirmatively show the 'official charged acted personally in the

---

[10] Plaintiff originally alleged that Sheriff Kimbrough and all agents, employees, and health care providers who worked for him at the Detention Center waived any potential governmental immunity defense because they are insured under bonds or insurance, "pursuant to N.C. Gen. Stat. §§ 153A-435 and 58-23." (*See* Compl. ¶¶ 199-200.) Under North Carolina law, a sheriff may waive his governmental immunity from suits for damages caused by an employee's negligent conduct either by purchasing liability insurance or by purchasing a surety bond, but only to the extent of such insurance coverage or bond. *McMahan v. Griffin*, No. 1:22-CV-00028-MR-WCM, 2023 WL 4551570, at *25 (W.D.N.C. July 14, 2023) (unpublished). To recover on surety bond, North Carolina courts require the joinder of the bond surety as a party to the action and allegations of waiver based on purchase of bond. *Id.* at *26. However, because Plaintiff subsequently abandoned her official capacity allegations here, this issue is moot.

deprivation of the plaintiff's rights.' " *Wright v. Hill*, No. 1:03-CV-109, 2004 WL 1618591, at *4 (M.D.N.C. July 16, 2004) (citing *Wright v. Collins*, 766 F.2d 841, 850 (4th Cir. 1985)). Here, there is no allegation that Sheriff Kimbrough had any personal interaction or involvement with Mr. Murphy-Renzi. Rather, Plaintiff alleges that Sheriff Kimbrough is liable because, as sheriff, he was responsible for "the formulation and execution of policies" regarding both the medical care of inmates and the general care and safekeeping of inmates at the Detention Center. (Compl. ¶¶ 219-20.) Plaintiff is therefore alleging Sheriff Kimbrough is liable based on his supervisory role.

The "doctrine of *respondeat superior* has no applicability to § 1983 claims." *Harbeck v. Smith*, 814 F. Supp. 2d 608, 626 (E.D. Va. 2011) (citing *Love-Lane v. Martin*, 355 F.3d 766, 782 (4th Cir. 2004)). However, under certain circumstances, "supervisory officials may be held liable … for the constitutional injuries inflicted by their subordinates." *Keeton v. Dudley*, No. 3:24-CV-321, 2024 WL 4438476, at *4 (E.D. Va. Oct. 7, 2024) (citing *Shaw v. Stroud*, 13 F.3d 791, 798 (4th Cir. 1994). This theory of liability is not based on *respondeat superior*, but on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care." *Timpson v. Anderson Cnty. Disabilities & Special Needs Bd.*, 31 F.4th 238, 257 (4th Cir. 2022) (quoting *Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984)). To succeed on a § 1983 claim for supervisory liability, a plaintiff must show:

> (1) that the supervisor had actual or constructive knowledge that h[er] subordinate was engaged in conduct that posed "a pervasive and unreasonable risk'" of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show "deliberate indifference to or tacit authorization of the alleged offensive practices,"; and (3) that there was an "affirmative causal link" between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Timpson*, 31 F.4th at 258 (citing *Shaw*, 13 F.3d at 799 (4th Cir. 1994)).

22

To satisfy the requirements of the first element, "a plaintiff must show the following: (1) the supervisor's knowledge of (2) conduct engaged in by a subordinate (3) where the conduct poses a pervasive and unreasonable risk of constitutional injury to the plaintiff." *Shaw*, 13 F.3d at 799 (citations omitted). "Establishing a 'pervasive' and 'unreasonable' risk of harm requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* (citations omitted).

The second element requires a plaintiff to show "deliberate indifference to or tacit authorization of the alleged offensive practices." *Baynard v. Malone*, 268 F.3d 228, 235 (4th Cir. 2001). A plaintiff "may establish deliberate indifference by demonstrating a supervisor's continued inaction in the face of documented widespread abuses." *Id.* The "plaintiff assumes a heavy burden of proof in establishing deliberate indifference" because:

> Ordinarily, [the plaintiff] cannot satisfy his burden of proof by pointing to a single incident or isolated incidents …. A supervisor's continued inaction in the face of documented widespread abuses, however, provides an independent basis for finding he either was deliberately indifferent [to] or acquiesced in the constitutionally offensive conduct of his subordinates.

*Shaw*, 13 F.3d at 799 (quoting *Slakan*, 737 F.2d at 372-73). Lastly, again, the third element requires a plaintiff to show "an 'affirmative causal link' between the supervisor's inaction and the harm suffered by the plaintiff." *Shaw*, 13 F.3d at 799 (citation omitted).

Here, the Sheriff Defendants argue that Plaintiff fails to plausibly allege documented widespread abuses involving similar conduct and a failure to act in the face of past abuses, thus putting the first and second elements established in *Shaw* at issue. (Docket Entry 21 at 12-13.)

With respect to the first element, Plaintiff has plead sufficient factual allegations

establishing that Sheriff Kimbrough had knowledge of conduct engaged in by his subordinates that posed a pervasive and unreasonable risk of constitutional injury. In support of her claim against Sheriff Kimbrough in his individual capacity, Plaintiff alleges that Sheriff Kimbrough, as sheriff, had a non-delegable duty to provide care to detainees in his custody, including medical and mental health care. (Compl. ¶ 19.) Plaintiff also alleges that "the failure to appropriately monitor and provide medical care for inmates and detainees at the Detention Center are the result of long-standing failures to properly staff the Detention Center, to train detention officers, or to supervise detention officers to ensure compliance with official policy." (*Id.* ¶ 167.) Plaintiff alleges that Sheriff Kimbrough "had actual or constructive knowledge" that his subordinates, including "the detention officers, medical care providers, supervisors, agents, or employees who worked at the Detention Center were, and had been prior to March 12, 2022, engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, such as Jack." (*Id.* ¶ 222; *see also id.* ¶¶ 233, 236.)

Plaintiff has also pled sufficient factual allegations which, taken as true, would establish that the deliberate indifference to serious medical needs did not merely occur in isolated incidents. Plaintiff alleges that Sheriff Kimbrough was on notice of problems with how inmates were monitored in the Detention Center because at least seven other detainees or inmates died since 2012 "as the direct result of being denied appropriate medical care while being held in the Detention Center." (*Id.* ¶ 223.) Plaintiff also alleges that a 2016 report and 2023 FCSO survey found significant problems and "ma[de it] clear that staffing, training, and compliance with written policies were all woefully deficient for years … and that the Sheriff was aware of these problems." (*See id.* ¶¶ 172-83.) Moreover, Plaintiff alleges a widespread pattern of inadequate,

harmful, and sometimes fatal treatment of the residents of the Detention Center, and that Sheriff Kimbrough had more than a mere passive awareness of it. (*See id.* ¶ 224.) Rather, Plaintiff alleges that "repeated instances of injury or death to other inmates and detainees," occurred at the Detention Center and that "by his conduct, Sheriff Kimbrough created and encouraged a culture of neglect and indifference towards inmates and detainees in the Detention Center." (*Id.*)

Taking these allegations as true, even if the inmate and detainee deaths occurred prior to Sheriff Kimbrough's tenure as Sheriff and even if they are not factually identical to the instant case (*see* Docket Entry 21 at 12-13), it remains plausible that those deaths, in conjunction with the 2023 survey, the 2016 report, his own alleged contributions to the Detention Center's culture, and the other alleged instances of harmful mistreatment alleged put Sheriff Kimbrough on notice that his subordinates had engaged in constitutional violations on multiple occasions. *See Timpson*, 31 F.4th at 257-58 (citation omitted); *cf. Sawyer v. Stolle*, No. 2:11CV446, 2011 WL 6396592, at *11 (E.D. Va. Dec. 20, 2011) (unpublished) (stating that where Sheriff was alleged to have knowledge of previous deaths at jail, "failure to act in the face of the documented abuses which occurred under [the care of a private medical services contractor] likely rises to the level of deliberate indifference."). Thus, the first *Shaw* element is satisfied; Plaintiff has plausibly stated a claim for a pervasive unreasonable risk of harm.[11]

---

[11] *See, also, e.g.*, *Est. of Wilson by & through Jackson v. Cnty. of San Diego*, No. 20-CV-457-BAS-DEB, 2020 WL 3893046, at *5 (S.D. Cal. July 10, 2020) (unpublished) ("The Complaint is supported by specific examples of death and injury of inmates due to the denial of needed medical care. Thus, Plaintiffs have adequately pled a policy of inaction or of failure to provide adequate medical care. Plaintiffs have adequately pled a *Monell* claim and the Court DENIES the Motion to Dismiss this claim."); *McKinney v. Johnson Cnty.*, Texas, No. 3:22-CV-2264-N, 2023 WL 8816385, at *7 (N.D. Tex. Dec. 19, 2023) (unpublished) (similar).

Case 1:24-cv-00211-WO-JLW    Document 29    Filed 02/10/25    Page 25 of 47

With respect to the second element, Plaintiff has plead sufficient factual allegations, detailed extensively above, establishing that Sheriff Kimbrough's response to the alleged widespread behavior that posed the pervasive and unreasonable risk of constitutional injury was so inadequate as to show deliberate indifference to or tacit authorization of the constitutional violations that allegedly led to Mr. Murphy-Renzi's death. (*Id.* ¶¶ 222-24.) Finally, with respect to the third element, Plaintiff has plead sufficient factual allegations establishing an affirmative causal link between Sheriff Kimbrough's continued inaction in the face of documented widespread abuses and Mr. Murphy-Renzi's death. (*Id.* ¶¶ 12, 163, 221-27.) For example, Plaintiff alleges that "[a]s a direct and proximate result of said policies, practices, and customs, Jack's rights under the ... Constitution, including rights secured by the Fourth and Fourteenth Amendments, and by other federal laws were violated." (*Id.* ¶ 225.) Moreover, Plaintiff alleges that

> *As a direct and proximate result* of Sheriff Kimbrough's deprivation of Jack's constitutional and federal rights as alleged herein, (a) Jack's life-threatening mental health and medical condition went unaddressed throughout his detention in March 2022 and (b) he was denied emergency care after Corporal Gilroy observed Jack in a condition that caused Corporal Gilroy to be concerned about whether Jack was breathing. *As a result*, Jack died a [preventable] death.

(*Id.* ¶ 227 (emphasis added).) These factual allegations, taken as true, satisfy the second and third *Shaw* elements recited above. Therefore, because Plaintiff has plead adequate factual allegations to establish a plausible supervisory liability claim against Sheriff Kimbrough pursuant to § 1983, the undersigned recommends that Sheriff Kimbrough's Motion to Dismiss should be denied as to the subclaim against Sheriff Kimbrough in his individual capacity within Plaintiff's Second claim. *See Fields v. King*, 576 F. Supp. 3d 392, 411 (S.D.W. Va. 2021).

**Claim Three - Plaintiff has stated a claim for deliberate indifference against Corporal Gilroy and Officer Tyner.**

In Claim Three, Plaintiff alleges that Corporal Gilroy and Officer Tyner are liable in their individual capacities for deliberate indifference to Mr. Murphy-Renzi's medical needs. Again, § 1983 individual liability may be established via personal involvement or under a theory of supervisory liability; here, Plaintiff alleges that Corporal Gilroy and Officer Tyner should be held liable under a theory of personal involvement. A prison official can act with deliberate indifference if he deliberately denies or delays access to medical care. *See Estelle*, 429 U.S. 97, 104-05 (1976); *Loe v. Armistead*, 582 F.2d 1291, 1296 (4th Cir. 1978) ("unusual length of the delay provides a reasonable basis for the inference" of deliberate indifference to a serious medical need).

Although the Sheriff Defendants argue that Claim Three should be dismissed for failure to state a claim (Docket Entry 21 5-20), none of their arguments mention Corporal Gilroy nor Officer Tyner specifically. Instead, much of the Sheriff Defendants' argument focuses on the insufficiency of the complaint in general terms and in terms of Sheriff Kimbrough. However, Defendants do argue that the Complaint "fails the third element" of the *Short* test for deliberate indifference because it "does not plausibly allege that any Sheriff Defendant knew, or should have known, of [Mr. Murphy-Renzi's condition of having an] abnormal heartbeat." (*Id.* at 7-8).

The undersigned agrees that there is no allegation that any of the Sheriff Defendants had actual or constructive knowledge of Mr. Murphy-Renzi having an abnormal heartbeat. However, as established above, Plaintiff has alleged facts sufficient to state a claim that Mr. Murphy-Renzi's serious medical need fell into the condition-obvious-to-a-layperson category. Again, Plaintiff has alleged that Murphy-Renzi was exhibiting erratic and bizarre behavior that

27

was obvious to other inmates and that Jernigan heard that Mr. Murphy-Renzi had been asking officers for help throughout the day on March 11, 2022. (Compl. ¶¶ 94(d), 101, 103, 115, 118, 123, 130, 131, 138, 139, 154.) Therefore, the Sheriff Defendants' motion to dismiss the claims against Officer Tyner and Corporal Gilroy for deliberate indifference should not be granted on the basis that Plaintiff failed to allege their knowledge of an abnormal heartbeat.

The Sheriff Defendants go on to argue that Claim Three fails to state a claim because "the complaint does not plausibly allege proximate cause, the fourth [*Short*] element." They argue that Plaintiff "tell[s] a story about a detainee with allegedly-untreated mental health symptoms who committed suicide. But that is not what happened. Rather, the complaint admits the manner of death was 'natural,' … resulting from what Plaintiff acknowledges was a 'heart condition.' " (Docket Entry 21 at 8-9.) The Sheriff Defendants argue that there is "[n]o analogous link between the alleged behavior and the cause of death[.]" (*Id.* at 9.)

The undersigned disagrees. The Complaint does not allege that Mr. Murphy-Renzi committed suicide. Rather, it alleges that Mr. Murphy-Renzi both threatened suicide (Compl. ¶¶ 5, 101, 137) and (according to notes taken by NaphCare employees) denied suicidal ideation (*id.* ¶¶ 52, 63, 64(b), 94(e)); that a NaphCare employee assumed or believed he was on suicide watch based on his behavior (*id.* ¶¶ 10, 100, 158, 211); and that Officer Tyner called a "Code Orange" for a suicide attempt over the radio after Mr. Murphy-Renzi's death (*id.* ¶ 122). Plaintiff does not "admit" that the manner of death was natural; rather, Plaintiff alleges that "[t]he medical examiner determined that Jack's manner of death was natural and that his cause of death was '[p]robable cardiac dysrhythmia with contraction band necrosis[.]' " The Sheriff Defendants

neglect to mention Plaintiff's subsequent allegations regarding the medical examiner's detection of a drug in Mr. Murphy-Renzi's blood and numerous injuries to his body. (*See id.* ¶¶ 141-44.)

Indeed, Plaintiff disputes how "natural" Mr. Murphy-Renzi's death was with her many allegations that his death was wrongful and caused by misconduct of personnel employed by the Detention Center to monitor and care for him. (*See generally id.*) Plaintiff explicitly alleges that "the conduct of [the Sheriff] Defendants… was a proximate cause of Jack's death." (*Id.* ¶ 269; *see also id.* ¶¶ 12, 162, 163, 206, 232, 234, 235, 238, 239, 263.) With regards to Corporal Gilroy and Officer Tyner, Plaintiff alleges Mr. Murphy-Renzi died as a result of their "deprivation of Jack's constitutional and federal rights." (*Id.* ¶ 239.) Plaintiff alleges said deprivation included a multitude of "failing[s]," similar to those alleged against Sheriff Kimbrough above. Here, those include failing to comply or be familiar with proper methods or policies, procedures, statutes, administrative codes, and practices for identifying, evaluating, assisting, treating, and monitoring intimates and detainees (both those in general population and segregation) with serous medical or mental health conditions or who are experiencing medical emergencies, and failing to ensure residents of the Detention Center are provided with adequate medical care and protection from "emergency and perilous medical conditions[.]" (*Id.* ¶ 232.)

Plaintiff also alleges that Corporal Gilroy and Officer Tyner had actual or constructive knowledge that Detention Center personnel engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to inmates and detainees, including Jack. (*Id.* ¶ 233.) Plaintiff goes on to allege that

> Corporal Gilroy and Officer Tyner had actual or constructive knowledge that Jack was suffering from serious mental health or medical conditions because they witnessed or knew he was exhibiting strange behavior, refusing meals, recreation time, or showers and that in the early morning hours of March 12,

29

2022, he was in medical distress lying naked on the floor of his cell and was experiencing a serious or life-threatening emergency.

(*Id.* ¶ 234.)  More specifically, Plaintiff alleges that Corporal Gilroy was assigned to the housing area where Mr. Murphy-Renzi was being held, and that when he made rounds less than an hour before Mr. Murphy-Renzi was discovered dead, he "saw Jack lying naked on the floor of his cell and was concerned enough that he felt the need to ensure Jack was breathing[.]" (*Id.* ¶¶ 8, 102, 113-14, 116, 156, 227.)  Plaintiff also alleges that Officer Tyner was responsible for conducting security rounds in Mr. Murphy-Renzi's housing area on the night he died, and that "Officer Tyner repeatedly walked past Jack's cell during security rounds without looking in to check on Jack's condition, which was required by FCSO policy and state law." (*Id.* ¶ 7.) Plaintiff further alleges that Officer Tyner "saw Jack 'up walking around speaking to himself, staring at the wall.  I asked if he was alright, there was no response from him.' " (*Id.* ¶ 103.) Plaintiff goes on to allege that Officer Tyner's monitoring of Mr. Murphy-Renzi was inadequate throughout the night because he repeatedly walked past his cell without stopping to observe his condition.  (*See id.* ¶¶ 7, 102-12, 116-17.)

Plaintiffs allege that despite this, neither sought help.  "Corporal Gilroy and Officer Tyner failed to report Jack's behavior to their supervisors or to any medical personnel and then failed to obtain any medical care for Jack[.]" (*Id.* ¶ 235.)  Plaintiff alleges that this lack of response to said knowledge "even after repeated instances of injury or death to other inmates and detainees, was so inadequate as to show deliberate indifference to or tacit authorization of the offensive practices described herein." (*Id.* ¶ 236.)  Plaintiff goes on to allege that "by their conduct, these Defendants created and encouraged a culture of neglect and indifference towards inmates and detainees in the Detention Center." (*Id.*)  Ultimately Plaintiff alleges that

30

the inaction by Corporal Gilroy and Officer Tyner amounted to a violation of Mr. Murphy-Renzi's constitutional right to receive reasonable medical treatment.

Again, the undersigned notes that the Complaint is not a model of clarity. Plaintiff does not appear to adhere to any one specific theory of what precisely caused Mr. Murphy-Renzi's death. However, it is likely that further factual development will enable the parties to fully address the dispute over Mr. Murphy-Renzi's cause of death and the culpability of those whose job it was to observe and care for him in the moments leading up to his death, both of which are at issue here. Given Plaintiff's allegation that Mr. Murphy-Renzi had a serious medical condition, being adequately monitored by Corporal Gilroy and Officer Tyner and/or having his behavior reported to a superior or to medical personnel might have prevented his death. Thus, taken as true, it is plausible that there is an affirmative causal link between Mr. Murphy-Renzi's death and Corporal Gilroy and Officer Tyner's allegedly inadequate monitoring and inaction in the face of warning signs about Mr. Murphy-Renzi's apparently deteriorating condition. Accordingly, the Sheriff Defendants' motion to dismiss Claim Three against Corporal Gilroy and Officer Tyner should be dismissed.

**The Court is unable to make a recommendation on qualified immunity at this stage.**

The Sheriff Defendants argue that they are entitled to qualified immunity as to the individual-capacity claims against them. (*See* Docket Entry 21 at 9-11.) Qualified Immunity "is an affirmative defense that shields government officials performing discretionary functions from personal-capacity liability for civil damages under § 1983, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Lee v. Queen Anne's Cnty. Off. of Sheriff*, No. CIV.A. RDB-13-672, 2014 WL 476233,

at *12 (D. Md. Feb. 5, 2014) (unpublished) (citing *Occupy Columbia v. Haley*, 738 F.3d 107, 118 (4th Cir. 2013) (internal quotation marks omitted); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).

The Court may consider affirmative "defenses on a 12(b)(6) motion only 'when the face of the complaint clearly reveals the existence of a meritorious affirmative defense.' " *Basilica v. Harris*, 658 F. Supp. 3d 285, 297 (E.D. Va. 2023) (citing *E. Shore Mkts., Inc. v. J.D. Assocs. Ltd. P'ship*, 213 F.3d 175, 185 (4th Cir. 2000); *Brooks v. City of Winston-Salem*, 85 F.3d 178, 181 (4th Cir. 1996)). The Supreme Court urges lower courts to resolve qualified immunity questions "at the earliest stage possible in litigation." *Pearson v. Callahan*, 555 U.S. 223, 232 (2009) (internal quotation omitted). The Fourth Circuit recognizes, however, that "[o]rdinarily, the question of qualified immunity should be decided at the summary judgment stage." *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) (noting that a court must reserve for trial the question of material fact concerning whether the alleged conduct occurred).

Here, Sheriff Kimbrough's individual liability arises, if at all, due to his alleged failure to prevent his subordinates' actions under a theory of supervisory liability. "In the Fourth Circuit, the law of supervisory liability has been firmly established for quite some time." *Lee*, 2014 WL 476233, at *13 (citing *Shaw*, 13 F.3d at 801-02). "Therefore, Sheriff [Kimbrough's] qualified immunity depends upon the more factual questions surrounding [Plaintiff's] Fourteenth Amendment claims .... At this early stage in this litigation, this Court is unable to make any final ruling on the availability of qualified immunity." *Id.*

As to Corporal Gilroy and Officer Tyner, their liability arises, if at all, under a theory of personal involvement, specifically regarding their allegedly inadequate monitoring and inaction in the face of Mr. Murphy-Renzi's allegedly deteriorating condition and erratic behavior leading

32

up to his death. Because Plaintiff has plausibly alleged that these Defendants violated Mr. Murphy-Renzi's constitutional right to receive adequate medical care as a pretrial detainee and to be free from deliberate indifference to his medical needs, and because said right is clearly established,[12] the qualified immunity analysis here also requires further factual development, and a final ruling would be premature at this stage here as well. Accordingly, Plaintiff's claims against the Sheriff Defendants should not be dismissed on the basis of qualified immunity.

## Claim Four - Plaintiff has stated a claim for wrongful death via negligent hiring, retention, or supervision against NaphCare.

In Claim Four, Plaintiff alleges that NaphCare is liable for wrongful death as well as negligent hiring, retention, and supervision. (Compl. ¶¶ 241-52; *id.* at 57.) Plaintiff alleges that NaphCare had a duty to provide medical and mental health care services to inmates and detainees at the Detention Center. (*Id.* ¶¶ 15-16, 34-38.) Plaintiff alleges that

> [b]ecause it had chronic staffing shortages and relied on temporary employees and unlicensed personnel to provide medical services, NaphCare knew or should have known that its physicians, nurses, staff, agents, employees, and assigns were not competent and fit to provide medical care and that it had failed to appropriately train or supervise its physicians, nurses, staff, agents, employees, and assigns.

(*Id.* ¶ 246.) Plaintiff alleges that "NaphCare's violations of the standard of care were negligent, grossly negligent, willful and wanton, and reckless," and that they were a proximate cause of Jack's injuries and death. (*Id.* ¶ 247-48.) Plaintiff seeks damages under the North Carolina Wrongful Death Statute, N.C. Gen. Stat. § 28A-18-2. (*Id.* ¶ 249.)

---

[12] "A prisoner's right to adequate medical care and freedom from deliberate indifference to their medical needs has been clearly established by the Supreme Court and this Circuit since at least 1976." *Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016). "The Fourth Circuit has repeatedly "recognized this clearly established right of pretrial detainees." *See Knouse v. Primecare Medical of West Virginia*, 333 F. Supp. 3d 584, 590 (S.D.W. Va. 2018).

NaphCare argues that Plaintiff fails to "articulate which facts are intended to support [a wrongful death claim]," and that "this claim fails for … want of factual allegations establishing negligent conduct causally related to Mr. Murphy-Renzi's death." (Docket Entry 13 at 16.) NaphCare argues that "Plaintiff has failed to allege a specific negligent act committed by a NaphCare employee, and she certainly has not identified who NaphCare negligently hired, retained, or supervised." (*Id.* at 14-15.) NaphCare further argues that "Plaintiff's claim still falls short in alleging sufficient facts to establish a causal connection between any conduct of NaphCare or its employees and Mr. Murphy-Renzi's death." (*Id.* at 15.) NaphCare argues that "[Plaintiff's] blanket assertion that earlier observation by a NaphCare provider would have somehow prevented Mr. Murphy-Renzi's death is purely speculative and unsupported by any factual allegations indicating how this would have altered the outcome." (*Id.*)

Under North Carolina's wrongful death statute,[13] a plaintiff bringing a wrongful death action must allege "(1) a wrongful act resulting in death, (2) causation, and (3) damages." *Hensley v. Suttles*, 167 F. Supp. 3d 753, 766 (W.D.N.C 2016), *aff'd sub nom. Hensley on behalf of North Carolina v. Price*, 876 F.3d 573 (4th Cir. 2017); *accord Thompson v. City of Charlotte*, No. 3:20-CV-370-MOC-DSC, 2020 WL 7033966, at *7 (W.D.N.C. Nov. 30, 2020) (unpublished) (claim against defendant of act or omission causing death sufficient to state claim for wrongful death) (citing *Lane v. Dorney*, 250 N.C. 15, 21 (1959)). Negligence is a "wrongful act" upon which a wrongful death claim may be predicated. *Bailey v. Gitt*, 135 N.C. App. 119, 120, 518 S.E.2d 794, 795 (1999). Plaintiffs "support a wrongful death claim by depicting a course of behavior that would

---

[13] "The wrongful death statute in North Carolina provides a remedy to the personal representative of a decedent's estate when the decedent would have otherwise been entitled to damages caused by the defendant's 'wrongful act, neglect[,] or default.' " *Franklin v. City of Charlotte*, 64 F.4th 519, 537 (4th Cir. 2023).

34

have allowed [the decedent] to 'maintain[ ] an action for negligence or some other misconduct if [he] had survived.' " *Burroughs v. Page*, No. 1:17CV463, 2019 WL 5561043, at *9 (M.D.N.C Oct. 28, 2019) (quoting *Nelson v. United States*, 541 F. Supp. 816, 818 (M.D.N.C. 1982)).

A wrongful death negligence claim must be based on actionable negligence under the general rules of tort liability. *Mabrey v. Smith*, 144 N.C. App. 119, 122, 548 S.E.2d 183, 186 (2001) (citing *Mann v. Henderson*, 261 N.C. 338, 134 S.E.2d 626 (1964)). "The elements of negligence are: 1) legal duty; 2) breach of that duty; 3) actual and proximate causation; and 4) injury. (*Id.* (citing *Tise v. Yates Constitution. Co., Inc.*, 345 N.C. 456, 480 S.E.2d 677 (1997)). Here, Plaintiff advances her wrongful death claim under a theory of negligent hiring, supervision, or retention, which, in order to state a claim, requires a Plaintiff to show the following:

> (1) the specific negligent act on which the action is founded[;] … (2) incompetency, by inherent unfitness or previous specific acts of negligence, from which incompetency may be inferred; and (3) either actual notice to the master of such unfitness or bad habits, or constructive notice, by showing that the master could have known the facts had he used ordinary care in oversight and supervision … ; and (4) that the injury complained of resulted from the incompetency proved.

*Taft v. Brinley's Grading Servs., Inc.*, 738 S.E.2d 741, 749 (N.C. App. 2013) (emphasis removed) (quoting *Medlin v. Bass*, 327 N.C. 587, 591, 398 S.E.2d 460, 462 (1990)). Inherent to this cause of action is the employer-employee relationship. *Newton v. City of Charlotte*, No. 3:14-CV-00672-FDW, 2015 WL 346949, at *5 (W.D.N.C. Jan. 26, 2015) (unpublished). "An essential element of a claim for negligent retention of an employee is that the employee committed a tortious act resulting in plaintiff's injuries." *Waddle v. Sparks*, 331 N.C. 73, 414 S.e.2d 22, 29 (1992).

As described above, the parties dispute whether Plaintiff sufficiently alleged the existence of a specific negligent act or omission committed by a NaphCare employee. At the outset, the undersigned notes that Plaintiff has failed to allege any intentional tortious act; rather, her claim

35

relies on a theory of negligence. Plaintiff alleges that NaphCare employee Temara Carthens, a "discharge planner" ("Carthens"), had contact with Mr. Murphy-Renzi on March 10, 2022, and asserts she was not a licensed medical professional, counselor or social worker. (*Id.* ¶ 96.) The only specific instance of negligence that Plaintiff mentions is Carthens observing Mr. Murphy-Renzi during a segregation round and failing to inform anyone of Mr. Murphy-Renzi's bizarre behavior. (Compl. ¶¶ 94(e), 95-100, 158; *see also* Docket Entry 17 at 20-21).

Plaintiff alleges Carthens had a duty to Mr. Murphy-Renzi "to promptly identify and inform custody officials of patients who are physically or psychologically deteriorating and those exhibiting other signs or symptoms of failing health" (*id.* ¶¶ 151-52), and to provide him with adequate medical care (*see id.* ¶ 244). Plaintiff alleges Carthens breached that duty by failing to report Jack's behavior to a licensed medical or mental health professional and by failing to further assess his condition. (*Id.* ¶ 158.) Plaintiff also alleges that NaphCare breached said duty by failing to view and enter Mr. Murphy-Renzi's medical records from his prior detention, by failing to appropriately monitor him, by failing to abide by NaphCare policies, by failing to train, supervise, and evaluate its employees, and by "relying on unlicensed non-medical personnel to perform medical services and to monitor Jack's condition." (*See id.* ¶ 245.) Plaintiff alleges this caused Mr. Murphy-Renzi's death. (*See id.* ¶¶ 248, 250.) At the motion to dismiss stage, these allegations are sufficient to state a claim for negligence.[14]

---

[14] " 'Proximate cause is a cause which in natural and continuous sequence, unbroken by any new and independent cause, produced the plaintiff's injuries, and without which the injuries would not have occurred.' " *Small v. WellDyne, Inc.*, 927 F.3d 169, 175 (4th Cir. 2019) (citations omitted)). "Only when the facts are all admitted and only one inference may be drawn from them will the court declare whether an act was the proximate cause of an injury or not." *Adams v. Mills*, 312 N.C. 181, 322 S.E.2d 164, 172 (1984). "[B]ecause that is rarely the case, what is the proximate cause of an injury is ordinarily a question for the jury." *Id.* Thus, NaphCare's argument to the contrary (Docket Entry 13 at 15-16) is unavailing.

Having determined Plaintiff has stated a claim for the requisite underlying specific negligent act, the undersigned now turns to the remaining three factors for negligent hiring, supervision, or retention. Plaintiff has alleged Carthens was incompetent because she "was not (and still is not) licensed as a medical professional or as a counselor or clinical social worker by the state of North Carolina" (*see id.* ¶ 96) and because her reports regarding Mr. Murphy-Renzi's condition were inaccurate and erroneous (*id.* ¶¶ 97-100). Plaintiff alleges NaphCare was on notice of such unfitness because it knew or should have known its employees (including Carthens) were incompetent because "it had chronic staffing shortages and relied on temporary employees and unlicensed personnel to provide medical services" and because "it had failed to appropriately train or supervise" its employees. (*Id.* ¶ 246). Again, Plaintiff alleges that "NaphCare's acts constitute a proximate cause of Jack's injuries and death[.]" (*Id.* ¶ 248, 250.) Because Carthen's alleged failure to competently document Mr. Murphy-Renzi's condition and report it to superiors could have plausibly contributed to and resulted in his death, the undersigned recommends that NaphCare's motion to dismiss Claim Four be denied.

**Claims Five, Six, Seven, and Eight - Because the Sheriff Defendants have public official immunity, Plaintiff's state-law claims against them fail.**

In Claim Five, Plaintiff alleges that Sheriff Kimbrough is liable for wrongful death. (Compl. ¶¶ 253-58; *id.* at 60.) Again, Plaintiff concedes that the Sheriff Defendants' evidence establishes governmental immunity as to the official capacity claims. (*See* Docket Entry 26 at 22.) Thus, the undersigned recommends that the Sheriff Defendants' motion to dismiss as to the wrongful death subclaim against Sheriff Kimbrough in his official capacity be granted and turns now to the individual capacity subclaim.

Case 1:24-cv-00211-WO-JLW   Document 29   Filed 02/10/25   Page 37 of 47

Plaintiff alleges that Sheriff Kimbrough had a duty to "be informed of Jack's general health and any emergency or dangerous medical or mental health issues;" to adequately staff the Detention Center, to ensure that Detention Center employees adequately supervised Mr. Murphy-Renzi "to maintain safe custody and control" of him; to "ensure that routine and emergency medical and mental health care would be provided when Jack needed such care while he was in the custody" and to ensure that the Detention Center employees "performed their duties in such a way as to avoid placing Jack in danger of injury or death[.]" (Compl. ¶ 254.)

Plaintiff alleges Sheriff Kimbrough breached these duties by a variety of "failing[s]," including failing to adequately train, supervise, or instruct medical care providers and Detention Center employees to evaluate, monitor, assist, protect, and treat inmates and detainees with serious medical or mental health conditions or who were experiencing medical emergencies; and failing to implement and enforce compliance with proper methods, policies, or procedures to ensure adequate care was given. (*See id.* ¶ 255.) Plaintiff alleges Sheriff Kimbrough is liable for the conduct of NaphCare, Corporal Gilroy, and Officer Tyner "and such conduct is imputed to Sheriff Kimbrough through the doctrines of agency, vicarious liability, and *respondeat superior*." (*Id.* ¶ 256.) Plaintiff further alleges that Sheriff Kimbrough's acts and omissions were the direct and proximate cause of Mr. Murphy-Renzi's death. (*Id.* ¶ 257.)

In Claim Six, Plaintiff alleges that Corporal Gilroy and Officer Tyner are liable for wrongful death. (*Id.* ¶¶ 259-64; *id.* at 64.) Plaintiff alleges that Corporal Gilroy and Officer Tyner owed Mr. Murphy-Renzi a variety of duties, including duties to not place him in danger of injury or death, to supervise him so that he would remain safe while in custody, to stay informed of his medical or mental health issues, and to ensure that he received needed care

while incarcerated. (*See id.* ¶ 260.) Plaintiff alleges they breached this duty via failing to monitor, evaluate, assist, and care for Mr. Murphy-Renzi and attend to his medical and mental health needs while incarcerated, and by failing to comply with applicable policies, procedures, statutes, and administrative codes to provide him appropriate care. (*See id.* ¶ 261.)

In Claim Seven, Plaintiff alleges that the Sheriff Defendants are liable for injury to prisoner by jailer. (*Id.* ¶¶ 265-72; *id.* at 66.) Plaintiff alleges that the Sheriff Defendants were all "keepers of the jail" under N.C. Gen. Stat. § 162-55. (*See id.* ¶ 267.) Plaintiff alleges that the Sheriff Defendants' conduct "was so careless, wanton, and reckless that it demonstrated a thoughtless disregard of consequences and a heedless indifference to [Mr. Murphy-Renzi's] safety and rights." (*See id.* ¶ 268.) Plaintiff further alleges that said conduct "was a proximate cause of Jack's death and constituted a wrong or injury to Jack pursuant to N.C. Gen. Stat. § 162.55." (*Id.* ¶ 269.) Again, Plaintiff alleges that Sheriff Kimbrough is liable for the conduct of the other detention staff and medical providers via *respondeat superior*. (*See id.* ¶ 270.) Plaintiff seeks treble damages for this alleged violation. (*Id.* ¶ 272.)

Lastly, in Claim Eight, Plaintiff references and reiterates the duties and breaches alleged in the previous claims, and alleges that by their conduct, the Sheriff Defendants are liable for gross negligence. (*See id.* ¶¶ 273-78; *id.* at 68.) Plaintiff alleges that the violations alleged in Claims Five, Six, Seven, and Eight were committed within the course and scope of the employment of the respective Sheriff Defendants named in each. (*See id.* ¶¶ 256, 262; *see also id.* ¶¶ 19(d), 23(c), 26(a).)

The Sheriff Defendants support their motion to dismiss Claims Five, Six, Seven, and Eight against them by arguing that "Plaintiff's state law individual-capacity claims are barred

by public official immunity[.]" (Docket Entry 21 at 21.) They argue that Plaintiff has failed to sufficiently allege a malicious act. (*Id.* at 22-23.) The Sheriff Defendants argue that this is so because the factual allegations against Corporal Gilroy and Officer Tyner do not plausibly show malice, and because there are no allegations of Sheriff Kimbrough having any "direct involvement with this detention." (*Id.* at 23-24.) Lastly, the Sheriff Defendants argue that Plaintiff "has not plausibly alleged that any of [Sheriff Kimbrough's] subordinates committed, or are liable for, state law claims." (*Id.* at 24.)

In general, under North Carolina law, public officials "engaged in the performance of governmental duties involving the exercise of judgment and discretion" enjoy immunity from personal liability. *Meyer v. Walls*, 347 N.C. 97, 112, 489 S.E.2d 880, 888 (1997) (quoting *Smith v. Hefner*, 235 N.C. 1, 7, 68 S.E.2d 783, 787 (1952)). To maintain a suit against a public official in his or her individual capacity, "the plaintiff must make a *prima facie* showing that the official's actions (under color of authority) are sufficient to pierce the cloak of official immunity." *Moore v. Evans*, 476 S.E.2d 415, 421 (N.C. Ct. App. 1996) (citing *Epps v. Duke University*, 468 S.E.2d 846 (N.C. Ct. App. 1996)). "Actions that are malicious, corrupt[,] or outside of the scope of official duties will pierce the cloak of official immunity, thus holding the official liable for his acts like any private individual." *Id.* (citing *Gurganious v. Simpson*, 197 S.E. 163, 164 (N.C. 1938); *Golden Rule Ins. Co. v. Long*, 439 S.E.2d 599, 603 (N.C. Ct. App. 1993), *review denied*, 335 N.C. 555 (N.C. 1993)); *see also Baker v. Smith*, 224 N.C. App. 423, 434, 737 S.E.2d 144, 151 (2012) (explaining that prison guards and "assistant jailers are public officials entitled to immunity").

Malice and corruption are difficult to show because "it is presumed that a public official in the performance of his official duties acts fairly, impartially, and in good faith and in the

exercise of sound judgment or discretion, for the purpose of promoting the public good and protecting the public interest." *In re Annexation Ordinance No. 300-X*, 304 N.C. 549, 551, 284 S.E.2d 470, 472 (1981) (cleaned up). A public official "acts with malice when he wantonly does that which a man of reasonable intelligence would know to be contrary to his duty and which he *intends* to be prejudicial or injurious to another." *Grad v. Kaasa*, 321 S.E.2d 888, 890 (N.C. 1984) (emphasis added). Thus, elementally, a malicious act is an act (1) done wantonly, (2) contrary to the actor's duty, and (3) *intended* to be injurious to another. *Id.* (emphasis added)

Plaintiff does not allege that the Sheriff Defendants were acting outside the scope of their official authority, nor that they were engaged in the performance of governmental duties that did not involve the exercise of judgment and discretion. Although Plaintiff does allege that NaphCare's conduct was "corrupt" once in her complaint (Compl. ¶ 251), it is unsupported by any facts and is insufficient to plausibly allege that the Sheriff Defendants acted corruptly. *See Ransom v. Page*, No. 7:23-CV-00166-M, 2025 WL 77897, at *19 n.8 (E.D.N.C. Jan. 10, 2025) (citing *State v. Hair*, 114 N.C. App. 464, 468, 442 S.E.2d 163, 165 (1994) ("A corrupt intent means a wrongful design to acquire some pecuniary profit or other advantage.") (internal quotation mark omitted)). Thus, malice is the only theory of piercing the cloak of public official immunity under which Plaintiff may proceed.

Here, at the outset, the undersigned notes that "[a]lthough the [C]ourt found herein that [P]laintiff plausibly alleges deliberate indifference, deliberate indifference is not synonymous with malice." *See Baynard v. Malone*, 268 F.3d 268, 236 (4th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825, 835 (1994) ("deliberate indifference describes a state of mind

41

more blameworthy than negligence" but "is satisfied by something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result")).

Plaintiff never alleges that any of the Sheriff Defendants acted with actual or constructive intent to injure Mr. Murphy-Renzi. (*See generally* Compl.) Plaintiff's conclusory assertions that the Sheriff Defendants' acts and omissions were variously inattentive, careless, negligent, grossly negligent, willful, wanton, and reckless (*id.* ¶¶ 256-57, 262-63, 268, 276-77) cannot overcome public official immunity. *See Doe by next friend Pullen-Smith v. Qually*, No. 5:20-CV-523-FL, 2021 WL 2546456, at *11 (E.D.N.C. June 21, 2021) (citing *Meyer*, 347 N.C. at 114, 489 S.E.2d at 890 ("[A] conclusory allegation that a public official acted willfully and wantonly should not be sufficient, by itself, to withstand a Rule 12(b)(6) motion to dismiss. The facts alleged in the complaint must support such a conclusion.").

Likewise, although Plaintiff describes the Sheriff Defendants' conduct as "malicious" twice (Compl. ¶¶ 206, 285), these allegations are the sort of naked conclusions "devoid of further factual enhancement" that courts need not credit as true. *ACA Fin. Guar. Corp. v. City of Buena Vista, Virginia*, 917 F.3d 206, 211 (4th Cir. 2019); *see also McCullough v. Anne Arundel Cnty.*, Maryland, No. CV CCB-19-926, 2020 WL 836235, at *4 (D. Md. Feb. 20, 2020) (unpublished); *Bailey v. Campbell*, No. 522CV00052KDBDSC, 2022 WL 16849126, at *5 (W.D.N.C. Nov. 10, 2022) (unpublished). Thus, Plaintiff has failed to allege facts that support a conclusion that any of the Sheriff Defendants or any of Sheriff Kimbrough's other subordinates acted with malice.

Furthermore, the undersigned notes that defendants in similar cases have been found to be entitled to public official immunity. *See, e.g., Baker v. Smith*, 224 N.C. App. 423, 737 S.E.2d 144 (2012) (prior to suicide of detainee in jail, assistant jailers were alerted to strange behavior of

42

detainee and alleged to have improperly supervised detainee but were nevertheless entitled to public official immunity due to absence of allegation of malice); *Layman v. Alexander*, 294 F. Supp. 2d 784, 796 (W.D.N.C. 2003) (Defendant Sheriff's motion to dismiss granted pursuant to public official immunity because plaintiff's allegation failed to show defendant acted with malice; allegations of gross negligence insufficient to pierce public official immunity); *Olvera v. Edmundson*, 151 F. Supp. 2d 700, 706 (W.D.N.C. 2001) (defendant sheriff entitled to public official immunity where plaintiff alleged deliberate indifference rather than intention to injure).

Therefore, the Sheriff Defendants are entitled to public official immunity regarding the state law claims against them. Accordingly, the undersigned recommends that the Sheriff Defendants' Motion to Dismiss be granted as to Claims Five, Six, and Seven, and as to the subclaims claims against the Sheriff Defendants within Claim Eight.

**Claim Eight - Plaintiff has stated a claim for gross negligence against NaphCare.**

With regards to the remainder of Claim Eight, again, Plaintiff references and reiterates the duties and breaches alleged in her previous claims, and alleges that by its conduct, NaphCare too is liable[15] for Gross negligence. (*See id.* ¶¶ 273-78; *id.* at 68.) NaphCare argues that this claim should be dismissed because Plaintiff fails to establish ordinary or gross negligence against NaphCare, and because she fails to identify any intentional or wanton conduct by NaphCare, including any conduct that proximately caused Mr. Murphy-Renzi's death. (*See* Docket Entry 13 at 16-17.) For the following reasons, the undersigned disagrees.

---

[15] Unlike the Sheriff Defendants, medical personnel employed to care for inmates (like NaphCare) are not public officials for the purposes of public official immunity. *See Leonard v. Bell*, 254 N.C. App. 694, 705, 803 S.E.2d 445, 453 (2017).

The elements of ordinary negligence are set forth above. "[T]he difference between ordinary negligence and gross negligence is substantial." *Yancey v. Lea*, 354 N.C. 48, 53, 550 S.E.2d 155, 158 (2001), *superseded on other grounds by Piazza v. Kirkbride*, 372 N.C. 137, 827 S.E.2d 479 (2019). Conduct rises to the level of gross negligence "when the *act* is done purposely and with knowledge that such act is a breach of duty to others, i.e., a *conscious* disregard of the safety of others. An act or conduct moves beyond the realm of negligence when the *injury* or *damage* itself is intentional." *Id.* (citing *Brewer v. Harris*, 182 S.E.2d 345, 350 (N.C. 1971) (emphasis in original)). Indeed, under North Carolina law, gross negligence involves "wanton conduct," and "an act is wanton when it is done of wicked purpose, or when done needlessly, manifesting a reckless indifference to the rights of others." *F.D.I.C. v. Rippy*, 799 F.3d 301, 314 (4th Cir. 2015) (cleaned up). In determining gross negligence, a court looks to the "totality of circumstances," but "purposeful conduct and disregard for the safety of others" are "especially relevant factors." *Ray v. N.C. Dep't. of Transp.*, 366 N.C. 1, 13, 727 S.E.2d 675, 684 (2012).

Here, again, Plaintiff has alleged NaphCare's conduct was reckless, indifferent, willful, and/or wanton. (Compl. ¶¶ 206, 247, 250, 251, 256, 257, 276, 277, 285.) Plaintiff has plausibly alleged that NaphCare violated Mr. Murphy-Renzi's clearly established right to be free from deliberate indifference to his medical needs, and that he had a medical condition that posed him a substantial risk of serious harm. (*See id.* ¶¶ 164, 206, 209, 216.) Furthermore, Plaintiff has alleged that, due in part to Mr. Murphy-Renzi's apparently bizarre behavior, this condition should have been obvious to a layperson, and that it was in fact obvious to other inmates at the Detention Center. (*See id.* ¶¶ 99, 101, 103, 115, 118, 123, 130, 138, 139, 154.) Plaintiff also specifically alleged that NaphCare and its employees owed Mr. Murphy-Renzi a duty of adequate medical care,

44

which it breached, directly and proximately causing his death. (*See id.* ¶¶ 208, 216, 244-45, 247-48, 251, 274-77.)  Again, the undersigned recommended above that Plaintiff has stated a claim under *Short* for deliberate indifference to a serious medical need, and that NaphCare could be held liable because Plaintiff sufficiently alleged a custom that caused detainees, including Mr. Murphy-Renzi, to receive inadequate care resulting in harm and death.

Importantly to the gross negligence analysis, again, Plaintiff alleges that "[i]n Ms. Jernigan's interview, she stated that it was reported to her by one of her NaphCare colleagues that Jack had been asking officers for help throughout the day on March 11, 2022, but she did not know if he ever got any help." (*Id.* ¶ 131.)  This allegation does not specify which NaphCare colleague heard this and when.  But taking the facts alleged as true, such details could contribute to a more certain determination of whether the conduct of any NaphCare employee rose to the level of gross negligence.  Plaintiff's allegation makes it at least plausible that *prior to Mr. Murphy-Renzi's death* a NaphCare employee heard that he had been asking for help all day, and said employee then chose not to follow up, which would constitute a conscious disregard of the safety and/or a reckless indifference to the rights of Mr. Murphy-Renzi.  Again, Plaintiff has plausibly alleged that NaphCare employees knew or should have known that such disregard or indifference would be reasonably likely to result in injury or death, thus, this suffices as a plausible allegation of willful or wanton conduct.  (*See id.* ¶ 242-51.)  Again, such disregard is a highly relevant factor, especially given Plaintiff's allegation that at least one NaphCare employee assumed or believed Mr. Murphy-Renzi was on suicide watch.  (*Id.* ¶¶ 10, 100, 158, 211.)

As shown above, Plaintiff has sufficiently pled facts on each of the elements of negligence, on a claim that could constitute a conscious disregard,  and on a claim of deliberate indifference.

Together, these suffice to state a plausible claim of gross negligence against NaphCare. Ultimately, therefore, the undersigned recommends that NaphCare's motion to dismiss Claim Eight be denied. *Accord Est. of Long by & through Long v. Fowler*, 270 N.C. App. 241, 253, 841 S.E.2d 290, 299 (2020), *aff'd*, 2021-NCSC-81, 378 N.C. 138, 861 S.E.2d 686; *cf. Riddick v. Watson*, 503 F. Supp. 3d 399, 432 (E.D. Va. 2020) (denying Defendant's motion to dismiss gross negligence claim against CCS, a jail's private medical services provider, because the Court found "that the allegations in the Complaint regarding Plaintiff's § 1983 deliberate indifference claims against the CCS nurses also sufficiently state claims for negligence, gross negligence, and willful and wanton negligence against the CCS nurses, and against CCS under a theory a *respondeat superior*.").

## IV. <u>CONCLUSION</u>

For the foregoing reasons, **IT IS HEREBY RECOMMENDED** that NaphCare's Motion to Dismiss (Docket Entry 12) be **DENIED** and that the Sheriff Defendants' Motion to Dismiss (Docket Entry 20) be **GRANTED IN PART**; to the extent that the subclaim against Sheriff Kimbrough in his official capacity within Plaintiff's Second Claim be dismissed, that Plaintiffs' Fifth, Sixth, and Seventh claims be dismissed, and that the subclaims against the Sheriff Defendants within Plaintiff's Eighth Claim be dismissed; and **DENIED IN PART** as to the subclaim against Sheriff Kimbrough in his individual capacity within Plaintiff's Second Claim, and as to Plaintiff's Third Claim. Accordingly, the undersigned recommends that the following claims proceed: the First, Third, and Fourth Claims; the remaining subclaim within the Second Claim against Sheriff Kimbrough in his individual capacity; and the remaining subclaim within the Eighth Claim against NaphCare.

_____
　　/s/　Joe L. Webster
United States Magistrate Judge


February 10, 2025
Durham, North Carolina